# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

NACOLE M. JIPPING, TRUSTEE,

    Appellant,

v.

FIRST NATIONAL BANK ALASKA,

    Appellee.

Case No. 3:16-cv-00125 -SLG

BK. A15-00076-HAR

ADV. No. A15-90018-HAR

BAP No. AK-16-1155

## DECISION & ORDER ON APPEAL

Appellant Nacole M. Jipping, Trustee of the Chapter 7 bankruptcy estate of Omni Enterprises, Inc. ("Omni"), appeals the United States Bankruptcy Court for the District of Alaska's order granting summary judgment to First National Bank Alaska ("FNBA"). The bankruptcy court determined that FNBA held a valid security interest in the bank account owned by Omni in the months preceding Omni's filing a Chapter 7 bankruptcy petition, and therefore held that FNBA's sweep of the account was supported by its lien rights and not avoidable under 11 U.S.C. § 550.[1] On January 25, 2017, the Court heard oral argument on the appeal. Having considered the documents filed with the Court, the applicable law, and the arguments of the parties, the bankruptcy court's ruling granting summary judgment to FNBA and denying summary judgment to the Trustee is

---

[1] Various provisions of the Bankruptcy Code grant a Chapter 7 trustee the power to avoid certain transfers of property for the benefit of the bankruptcy estate. *See, e.g.*, 11 U.S.C. §§ 544, 545, 547, 548, 549, 553(b), 724(a). Once a transfer has been deemed avoidable in a bankruptcy case, § 550 is the vehicle a trustee uses to recover such property. The mechanics or proper application of these provisions are not at issue in this case.

REVERSED and REMANDED with directions to enter summary judgment in favor of the Trustee.

## BACKGROUND/JURISDICTION

Before filing for bankruptcy, Omni operated retail stores in Bethel, Alaska.[2] It maintained a bank account at FNBA from at least 2005 up to the date it filed for bankruptcy in 2015.[3] Omni and FNBA also maintained a borrower-lender relationship at certain times during that period. In July 2009, Omni borrowed $1.3 million from FNBA (the "2009 Loan").[4] The 2009 Loan was secured by a Commercial Security Agreement (the "2009 Security Agreement"), which included as collateral "Deposit Accounts."[5] The 2009 Security Agreement contained a future advances clause as well as a cross-collateralization clause that provided that the 2009 Security Agreement secured "all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender . . . whether now existing or hereafter arising."[6] The 2009 Security Agreement also contained a "Perfection of Security Interest" section stating: "This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full

---

[2] Docket 4-1 (Compl.) at 4.

[3] *Id.* at 6.

[4] *Id.* at 4.

[5] Docket 4-9 (2009 Security Agreement) at 1. Article 9 of the Alaska Uniform Commercial Code ("UCC") provides that "'deposit account' means a demand, time, savings, passbook, or similar account maintained with a bank except that the term does not include investment property or accounts evidenced by an instrument." ALASKA STAT. § 45.29.102(a)(36). Omni's FNBA-maintained bank account, which FNBA swept in 2015, was a Deposit Account. Docket 4-1 (Compl.) at 6.

[6] Docket 4-9 (2009 Security Agreement) at 1.

and even though for a period of time Grantor may not be indebted to Lender."[7] Omni paid off the 2009 Loan in full in July 2011, and had no indebtedness to FNBA until August 2013.[8]

In August 2013, Omni borrowed $2.6 million from FNBA for equipment for a new grocery store (the "2013 Loan").[9] The Commercial Security Agreement securing the 2013 Loan (the "2013 Security Agreement") granted FNBA a lien on a detailed list of specific items of equipment, but did not explicitly include "Deposit Accounts" or refer to the 2009 Security Agreement.[10] The 2013 Security Agreement contained an integration clause stating that "[t]his Agreement, together with the Related Documents, constitutes the entire understanding and agreement" between FNBA and Omni with respect to the 2013 loan.[11]

In early 2015, Omni defaulted on the 2013 Loan. FNBA debited Omni's FNBA-maintained bank account to satisfy the mortgage payments for January and February 2015.[12] In March 2015, FNBA swept Omni's account, seizing roughly $1.3 million, which it applied against the 2013 Loan.[13] The Trustee then filed this adversary action in bankruptcy court to recover the seized funds.[14] On cross-motions for summary judgment,

---

[7] Docket 4-9 (2009 Security Agreement) at 1.

[8] Docket 4-1 (Compl.) at 5.

[9] *Id.*

[10] *Id.* at 5.

[11] Docket 4-9 (2013 Security Agreement) at 8.

[12] Docket 4-1 (Compl.) at 6–7.

[13] *Id.* at 7.

[14] *Id.* at 1–2.

the bankruptcy court entered summary judgment for FNBA, after finding that (1) FNBA's security interest in the "Deposit Accounts" in the 2009 Security Agreement did not terminate when the 2009 Loan was paid off; and (2) the integration clause in the 2013 Security Agreement did not exclude the 2009 Security Agreement from applying to the 2013 loan.[15] Accordingly, the bankruptcy court concluded that the FNBA sweep was supported by its lien rights on Omni's bank account, and the Trustee could not avoid it under the Bankruptcy Code.[16]

The Trustee filed a timely notice of appeal on June 1, 2016.[17] FNBA then filed a notice of election to have the appeal decided by the district court,[18] to which the case was then transferred.[19] This Court has jurisdiction to review final orders of a bankruptcy court under 28 U.S.C. § 158(a)(1).

## ISSUES PRESENTED/STANDARD OF REVIEW

The parties agree that resolution of this appeal turns on whether FNBA held a valid security interest in Omni's FNBA-maintained bank account when FNBA swept the account in early 2015.[20] The Trustee challenges both of the findings of the bankruptcy

---

[15] Docket 4-10 (Order Granting FNBA's Mot. for Summ. J. and Final J. for Def.) at 1–2.

[16] Docket 4-8 (Mem. Decision Regarding Cross-Mots. for Summ. J.) at 17–18.

[17] Docket 3-1 (Transmittal Form) at 4–5.

[18] Docket 3-2 (Appellant Statement of Election).

[19] Docket 3 (Notice of Transfer of Appeal from Bankruptcy Court).

[20] Docket 12 (Appellant's Br.) at 8 n.6; Docket 14 (Appellee's Br.) at 14. The parties agree that if FNBA had a valid lien in the bank account, it may retain the swept funds and, if it did not, it must return the swept funds to the Trustee.

court.[21]

"The issues raised here involve interpretation of a security agreement executed between [Omni and FNBA] and the scope of a claimed security interest. The Alaska Uniform Commercial Code and applicable state law regarding contract interpretation will govern their resolution."[22] Under Alaska law, "[t]he objective of contract interpretation is to determine and enforce the reasonable expectations of the parties."[23]

This Court reviews de novo a bankruptcy court's ruling on cross-motions for summary judgment, its interpretation of security agreements, and its interpretation of state law.[24] Here, the parties agree that whether FNBA held a valid security interest in Omni's bank account when FNBA performed the sweep in early 2015 should be reviewed de novo.

**DISCUSSION**

The Trustee seeks reversal of the bankruptcy court's decision for two reasons. First, she argues that the 2009 Security Agreement, which provides that it terminates once the "Indebtedness" is paid in full, terminated in 2011 when Omni paid off the 2009

---

[21] Docket 12 (Appellant's Br.) at 6.

[22] *In re Alaska Fur Gallery*, 457 B.R. 764, 765 (Bankr. D. Alaska 2011) (footnote omitted); *see also Butner v. United States*, 440 U.S. 48, 55 (1979) (finding that whether a security agreement creates a lien on particular assets is a question of state law).

[23] *Norvill v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004).

[24] *See Trunk v. City of San Diego*, 629 F.3d 1099, 1105 (9th Cir. 2011) (summary judgment); *Conrad v. Ace Prop. & Cas. Ins. Co.*, 532 F.3d 1000, 1004 (9th Cir. 2008) (interpretation and meaning of contracts); *see also Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) (interpretation of state law).

Loan.[25]  FNBA responds that the 2009 Security Agreement defines "Indebtedness" to specifically include future advances[26] and also includes a cross-collateralization clause.[27] Therefore, FNBA maintains that the 2009 agreement, which included Omni's FNBA-maintained "Deposit Accounts" as collateral, was not terminated when the 2009 Loan was paid off.[28]  FNBA cites to a provision in the 2009 Security Agreement that it "is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be

---

[25] Docket 12 (Appellant's Br.) at 16–30.  The 2009 Security Agreement includes a "Survival of Representations and Warranties" clause that states:

> All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

Docket 4-9 (2009 Security Agreement) at 4.

[26] The 2009 Security Agreement states, "In addition to the Note, this Agreement secures all future advances made by lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes."  Docket 4-9 (Security Agreement) at 1.

[27] The "Cross-Collateralization" clause in the 2009 Security Agreement provides:

> In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or anyone or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

Docket 4-9 (Security Agreement) at 1.

[28] Docket 14 (Appellee's Br.) at 24–33.

indebted to Lender."[29]

As discussed below, the Court has determined that the second issue raised in this appeal is dispositive. Therefore, the Court will assume, without deciding, that the 2009 Security Agreement remained in effect after Omni paid off the 2009 Loan and turn to this second issue: whether the 2013 Security Agreement's integration clause precludes FNBA's reliance on the 2009 Security Agreement as security for the 2013 Loan.

The 2013 Security Agreement contains the following integration clause:

> **Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.[30]

FNBA maintains that the integration clause does not exclude the 2009 Security Agreement and instead argues that the 2009 Security Agreement is implicitly included as a "Related Document[]" referenced in the integration clause itself.[31] The bankruptcy court agreed with FNBA, concluding, "The reference to the 2009 Security Agreement is not specific, and is in fact exceedingly obscure. But, in parsing the meaning of Related Documents, I conclude the 2009 Security Agreement is **not excluded** by the integration clause; it is in fact **included**."[32] The bankruptcy court reasoned:

> The answer lies in the somewhat circular definitions of "Related Documents" and "Indebtedness" in the 2013 Security Agreement. It becomes a chicken-and-egg

---

[29] Docket 4-9 (2009 Security Agreement) at 1.

[30] Docket 4-9 (2013 Security Agreement) at 8.

[31] Docket 14 (Appellee's Br.) at 33–37.

[32] Docket 4-8 (Mem. Decision Regarding Cross-Mots. for Summ. J.) at 18–19 (emphasis in original).

question—does the integration clause exclude the 2009 Security Agreement or not? Despite this circularity, the Related Documents definition in the 2013 Security Agreement is sufficiently clear to mean, in this case [emphasis and bracket matter added]:

> **Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, *security agreements [such as the 2009 Security Agreement]*, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether *now or hereafter existing [such as the 2009 Security Agreement], executed [by virtue of the Future Advances clause in the 2009 Security Agreement] in connection with the Indebtedness [such as the 2013 loan]*.[33]

The Court finds, however, that FNBA and the bankruptcy court's interpretation constitutes a strained reading of the Related Documents clause, as perhaps best evidenced by the parentheticals added by the bankruptcy court. In this Court's view, a more natural reading of the Related Documents clause favors the Trustee's position. For the 2009 Security Agreement to secure payment for the 2013 Loan, the 2009 Security Agreement must be a "Related Document[]," meaning that it was "executed in connection with the Indebtedness." The bankruptcy court concluded that the 2009 Security Agreement was "executed in connection with" the 2013 Loan because the definition of "Indebtedness"[34] in the 2013 Security Agreement refers to "future advances," which the

---

[33] *Id.* at 18 (footnote omitted; emphasis in original); Docket 4-9 (2013 Security Agreement) at 9.

[34] The 2013 Security Agreement states:

> The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

bankruptcy court then interpreted to extend to the future advances clause of the 2009 Security Agreement.[35] But, as the bankruptcy court acknowledged, this interpretation of the 2013 clause constitutes a "somewhat circular" construction of the relevant terms so as to result in an "exceedingly obscure" connection between the 2009 and 2013 Security Agreements.[36]

Giving ordinary words their ordinary meaning, as required by Alaska law,[37] it is more logical to construe "in connection with the Indebtedness" in the 2013 Security Agreement to refer solely to those documents executed with respect to the 2013 Loan, thus excluding from "Related Documents" the 2009 Security Agreement, as that document was executed in connection with the 2009 Loan. And FNBA offers no evidence by way of conduct or independent contractual language that shows that FNBA or Omni intended to incorporate the 2009 Security Agreement into the 2013 Security Agreement.

Moreover, the Alaska Supreme Court has articulated an objective standard to contract interpretation.[38] A third party examining the 2013 Security Agreement would be unlikely to discern that the 2009 Security Agreement was incorporated into the 2013

---

Docket 4-9 (2013 Security Agreement) at 9.

[35] The "Future Advances" provision in the 2009 Security Agreement states: "In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes." Docket 4-9 (2009 Security Agreement) at 1.

[36] Docket 4-8 (Mem. Decision Regarding Cross-Mots. for Summ. J.) at 16–17.

[37] *Norville*, 84 P.3d at 1001 n.3 ("In interpreting contracts, . . . unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.") (quotation marks and citation omitted).

[38] *Martin v. Maldonado*, 572 P.3d 763, 767 (Alaska 1977).

Security Agreement. To do so would require the third party to have knowledge of the earlier-terminated loan and the 2009 Security Agreement, and to employ the circular interpretation used by the bankruptcy court. More to the point, it is unlikely that a potential creditor to Omni in 2012, after the 2009 loan had been paid in full, would have concluded that the 2009 Security Agreement would accord FNBA a continuing primary lien in the event that FNBA advanced future sums to Omni in 2013.

FNBA cites to an Alaska statute that provides that a security agreement may commit collateral to secure "future advances or other value."[39] But even if the parties had agreed in 2009 to include Omni's "Deposit Accounts" as collateral for any future loans, such as the 2013 Loan, any such agreement would be vitiated by the integration clause in the 2013 Security Agreement, unless the 2009 Security Agreement is treated as a "Related Document" in the 2013 Security Agreement. But, as a matter of law, the Court holds that the 2009 Security Agreement was not a "Related Document[]" and therefore does not secure the 2013 Loan.

FNBA also argues that "the 2009 Security Agreement constitutes a separate and distinct contract, capable of independent enforcement."[40] But as discussed above, the 2013 Security Agreement provides that it, along with the "Related Documents" that this Court has already concluded excludes the 2009 Security Agreement, "constitutes the entire understanding and agreement of the parties as to the matters set forth in th[at]

---

[39] Docket 14 (Appellee's Br.) at 20–21 (quoting ALASKA STAT. § 45.29.204(c) ("A security agreement may provide that collateral secures . . . future advances or other value, whether or not the advances or value are given pursuant to a commitment.")).

[40] Docket 14 (Appellee's Br.) at 21.

Agreement."[41] Clearly, the scope of collateral securing the 2013 Loan is a "matter[] set forth in the [2013] Agreement."[42] Thus, the integration clause in the 2013 Security Agreement precludes independent enforcement of the 2009 Security Agreement with respect to the swept assets.

**ORDER**

For the foregoing reasons, the judgment of the bankruptcy court is **REVERSED**, and the case is **REMANDED** to the bankruptcy court with direction to enter summary judgment in favor of the Trustee. The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 8th day of March, 2017 at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

---

[41] Docket 4-9 (2013 Security Agreement) at 8.

[42] *Id.*